IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
September 5, 2001 Session

## IN RE:    Z. C. G.

**Appeal from the Chancery Court for Sumner County**
**No. 2000 A-25      Tom E. Gray, Chancellor**

---

**No.  M2000-02939-COA-R3-CV - Filed October 22, 2001**

---

This case involves a request for termination of parental rights and adoption of a minor child. Appellees/Petitioners are the mother of the minor child at issue and her current husband.  They petitioned for termination of the natural father's  parental rights and for adoption by her current husband.  The trial judge granted their petition finding that the father had abandoned his child by willfully failing to visit for four months preceding the filing of the petition and that termination of parental rights was in the best interest of the child.  We find that the evidence did not clearly and convincingly demonstrate that the father willfully failed to visit and, thus, reverse the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Reversed and Remanded**

WILLIAM B. CAIN, J., delivered the opinion of the court, in which BEN H. CANTRELL, P.J., M.S.  and PATRICIA J. COTTRELL, J., joined.

Gary M. Williams, Hendersonville, Tennessee, for the appellant, Chadrick Jerome Goins.

Bill Easterly and James B. Lewis, Nashville, Tennessee, for the appellees, Jodie Lynn Bergquist and Mark Shane Bergquist.

**OPINION**

The child at issue in this matter, Z. C. G., is the biological child of Chadrick Jerome Goins, Appellant, and Jodie Lynne Bergquist, Appellee.  Ms. Bergquist re-married in May of 1999 to Mark Shane Bergquist, who decided to adopt Z. C. G. and joined in the petition**.**  Ms. Bergquist and Mr. Goins were divorced in January of 1999.  They had only one child, Z. C. G., who was born on November 6, 1994.

Ms. Bergquist alleged that Mr. Goins had been abusive and threatening to her and neglectful of Z. C. G. during their marriage.  She cited periods of lack of visitation and failure to pay child support in support of her Petition for Adoption and Termination of Parental Rights.  After the

hearing, the judge articulated his very detailed findings of fact. These findings provide an accurate history of the parties' divorce and subsequent custody problems:

[T]he Court has made some findings of fact and conclusions of law, and these cases are always difficult . . . .

Okay. The facts in this case are that Jodie Lynn Hensley and Chadrick Jerome Goins married in 1994. One child Z. C. G. was born to them on the 6th day of November, 1994.

. . . .

. . . [T]he wife did file a complaint for divorce in 1998 and on the 21st day of January, 1999, there was entered a final decree of divorce and that final decree of divorce was entered nunc pro tunc, meaning now for then, to the 22nd day of September, 1998.

The mother was granted custody of the minor child Z. C. G. and the father was granted specific visitation and there was a point of exchange of the child for visitation described as an Amoco station near where the mother lived. The mother was granted a judgment against the father for $400 in child support arrears.

Now, the visitation went fairly well, at least I have no evidence that it did not go fairly well, up until the 23rd day of April 1999. At that time the child was four and a half and the mother delivered the child to the father at the Amoco station for his scheduled visitation.

. . . [T]he father had an acquaintance with him . . . .

In the process of making the exchange the father conveyed not necessarily to the mother but at least where she heard it or he may have conveyed to her that he was going to take the child to the racetrack and take the child to the pits. The mother inquired as to who would take care of the child there at the pits and the father said that oh, there is always - - there are some women in the trailers that are there and one of them can, so at that point the mother refused to let the child go, she picked the child up, took the child back, got in her car, and Mr. Goins either backed or pulled his vehicle very close and he began to make threats to the mother and the child, threatened the life of both mother and child.

And that was really what the Court saw as the first incident - - that was the first incident where the mother had refused the visitation that had been awarded to the father on the scheduled basis. And there were some attempts to get the mother to change her mind, she did not change her mind even when the police came and

-2-

suggested that she do, and the paternal grandmother was involved, also the maternal grandfather, but she did not allow visitation.

The father didn't have any visitation then until June the 25th and 27th when he visited and there was a petition for contempt filed by the father alleging the mother to be in contempt of court . . . .

And then the mother filed a petition for order [ ] of protection . . . .

I think the father had filed his petition one or two days prior to that and the mother filed a petition for an order of protection on the 17th day of June, 1999, at which time she alleged that on April 23rd, 1999, that the father threatens to kill me and my child, has done so in the past, when we pass him, he screams, acts like he is shooting us. Order of protection has been ordered in the past. It ran out in March of 1999. The acts of Chad [are] very common and happen[] a lot. In the past he has physically and mentally abused me, and she says my son. There is no evidence that he had physically abused the child.

But the petition was filed. There was - - the father did have visitation in July and in August. He had visitation July 9th and 11th, July 23rd and 25th, August 6th and 8th, August 20th and 22nd, September 3rd and 5th and October 1 and 4 on his regular scheduled visitation and then the matter was heard in - - on the 4th day of October there was a hearing held, the mother was granted a petition for order of protection, and . . . [the] petition for contempt is dismissed. It is further ordered that the plaintiff's oral motion to restrict the defendant's visitation is hereby denied the plaintiff. The plaintiff was listed as Jodie Lynn Bergquist . . . .

Further, the judge ordered it is adjudged and decreed the parties will strictly comply with the visitation schedule and visitation guidelines set forth in the judgment of divorce and marital dissolution agreement incorporated and entered on the 21st day of January, 1999, nunc pro tunc.

Further, the Court said even though he dismissed the petition for contempt, . . . that the defendant's visitation with his son shall be expanded to include two nonconsecutive weeks of visitation during the summer months with the weeks to be agreed upon by the parties with the agreement being established by May 15th of each year.

And he said also that the parties - - well, ordered and adjudged and decreed that the parties' son be with the defendant on Thanksgiving Day of 1999. And the judge ordered that the parties shall continue to meet at McDonald's Restaurant on Peavine Road near Crossville, Tennessee, on those weekends during [ ] which the defendant is to visit with his son, the parties are to make every reasonable effort to

contact the other party and inform them of any impediments to them being on time for that meeting.

. . . .

And then as the Court has pointed out, there was visitation October 1 through 4 and then the father went to pick up the child on October the 15th, he took Mr. Humphreys with him, they went to Peavine Road McDonald's, the mother was late. And she has testified, and the Court finds the testimony credible, that there was in fact a great deal of congestion due to road construction and she did not get there until sometime after 6:00 p.m. Central Standard Time. She was supposed to have been there I believe at 5:00 p.m.

Now, Mr. Humphreys and Mr. Goins have testified that they got there at . . . 4:30 Central Standard Time, and that they waited approximately two hours. Perhaps they had just left when the mother arrived because the mother did get a - - she did go in and make an order at McDonald's on the 15th day of October, 1999, and she did save the receipt and it shows that she was there at 6:34 p.m. when she got this receipt . . . . [A]nd it shows that she in fact was there. The father didn't wait long enough.

And further the Court finds that she was there before 6:34 p.m. because it was her testimony that she had called her father for advice about what to do and he told her that she should make a purchase, get something and save this receipt. And the father missed that weekend of visitation.

Then the next time the father saw the child was the 7th day of November and the mother has testified and the Court finds it's credible and it's supported somewhat by the paternal grandmother's testimony that the mother had told the father that they were going to be at the bowling alley for a birthday party on November the 6th.

The mother testified that she had offered the father an opportunity to be there at the birthday party with the child. The father testified that he hadn't been told about the birthday party on November the 6th and that his mother found out some other way and his mother went over there to that - - on November the 6th, but his mother [and] the mother of the parties' child, Mrs. Bergquist, agreed for the child to visit with the paternal grandmother, grandparents and the father on November the 7th. That visitation took place.

On November the 12th and 14th there was visitation and the paternal grandmother picked the child up in Crossville. And then there was visitation with the father November the 25th and 27th for Thanksgiving. He had been awarded that in the most recent order that was entered on October the 4th, 1999.

On December the 10th, 1999, the mother and the father had a telephone conversation and this conversation - - this was December the 10th was the weekend that the father was to have visitation with the child . . . . December the 10th was on a Friday in 1999.

And they had a conversation. The father was wanting to have visitation on December the 17th, the following weekend, and they had a discussion. It did not appear to the Court that this was any type of argumentative type discussion. The mother had indicated that she had told Mr. Goins and had also told his mother earlier that the child was going to be in a Christmas play. That also has been corroborated that there had been some statement.

The question was what day was it going to be on, was it going to be on a Friday night or a Saturday night. What the situation was, was it on the weekend of December 17th, which was the mother's weekend to have the child. The child was to be in a Christmas program at his school and . . . . it was the mother's mother or some family members that were going to come down and visit[.] [T]here were some questions back and forth if they don't come down, I'm coming - - the mother was saying if they don't come down, I'm coming to Green County and yes, you can have the child, but for Mr. Goins apparently the conversation wasn't going anywhere to him and he just hung up. And so then there was no further visitation.

Also, on that - - in that December 10th call, the mother did tell the father that he could have the child all day Christmas, which to the Court, Christmas is December the 25th, she was saying you can have the child on December 25th. There was no response from the father about that offer.

Then the father didn't visit on December the 10th and then the mother from December the 24th to the 28th was in Greene county or at least part of the time was in Greene County, Tennessee. She was in - - she visited with her mother and with her father. She didn't call Mr. Goins, but he also did not call her.

I have no testimony at all about what these two people did for Christmas when they were married or what traditions they had, although it appears that the tradition in the Goins' family was that they celebrated with family members about a week before Christmas Day . . . .

. . . [S]ince November the 27th, 1999, there has been no visitation by the father with the child.

The father did call on February the 28th, spoke to the stepfather of the child for almost two minutes. 1.8 tenths minutes is what was recorded on the phone call. There is some disagreement about what was said. The stepfather testified that he

answered the telephone. The natural father says that he talked with the stepfather. At least they both agree they talked to each other. The disagreement is about what was said.

The stepfather did learn that the grandfather of the natural father had passed away and that the father wanted the child for a funeral and the stepfather said he told him to call back, that his wife, the mother of the child, wasn't at home.

Mr. Goins says that he wanted - - he had asked that Mrs. Bergquist return his call. She didn't return the call. She did get the message or got a message from her husband that Mr. Goins had called, that the grandfather had passed away, that he did want the child for the funeral.

There was no follow-up by Mr. Goins in calling the mother back and there was no visitation. The Court can't find and does not find that the mother denied the father visitation on February the 28th. The father just didn't call back.

Further, in this case the Court has heard the witnesses and, Mr. Goins, I find that you're not a credible witness. You didn't tell the truth from the witness stand. You did threaten and you have threatened the mother and I find that you have also hit her. You did tell the mother that you were going to take the child to the trailer down at the racetrack and that's probably what really started the matter.

. . . If I understand that, the mother's real complaint came about the trailer. You said you didn't tell her that. The Court finds you did.

Also, Mr. Goins, you said that you didn't say in the presence of the father that you could snap the mother's neck. The Court finds you did . . . .

In this situation on the - - you also had indicated you had not threatened the mother, and the mother had made testimony and also her husband, Mr. Bregquist, had made testimony that on one occasion in seeing you on the road and the three, Mr. Bergquist, Mrs. Bergquist and the minor child were in the car, Mr. Bergquist testified and Mrs. Bergquist, too, that you leaned over and using your hands and arms that you made a motion as if you were firing a rifle at them. I don't know that they made as good a description. They gave more of hand motions, but for the record they showed how one has an imaginary gun, rifle in his hand, and is pointing it at someone and making a shooting. That you did.

On October the 15th you appeared, the mother also appeared, it's unfortunate that you left early, but you just left early. It's also unfortunate that you didn't make a telephone call or try to make up that visitation.

You did call on February the 28th, 2000. You didn't follow up on that call. The Court is of the opinion it wasn't the mother's responsibility to take the initiative and follow back up, although under the circumstances with the death of your grandfather it would have been a kind thing for her to do. But you could have called back.

That's the only call that you made. Now, your mother did make some telephone calls which the biological mother did not attempt to return, didn't tell the child about. And under the - - but that's the paternal grandmother and it is the father who has been granted the specific visitation.

. . . .

But what the circumstances are, Mr. Goins, is that for more than a hundred and twenty days preceding the filing of this petition for adoption and termination of parental rights on the 13th day of June 2000, you have wilfully failed to visit and it's a willful failure to visit. The visitation was working. It's regrettable about the October 15th incident, but it seems that matters came on December the 10th when you didn't get December the 17th and you just hung up and did not make any more phone calls until February the 28th, then didn't follow up on that.

But the Court finds that by clear and convincing evidence that the father has willfully failed to visit and under Tennessee Code Annotated Title 36, under the definition of abandonment, it's clear - - it says abandonment is a willful failure to visit or wilful failure to pay child support. I find that you have willfully failed to visit and that is abandonment under the statutory definition.

. . . .

So the Court in this matter finds that by clear and convincing evidence on the issues of abandonment, the issues of the best interests of the minor child, that the Petitioners have carried the burden of proof and the Court does in fact terminate parental rights and does find that it's also in the best interests of the child that the Court enter an adoption for the stepfather and the Court will do that.

Mr. Goins presented the following issues for review:

1. Whether there was clear and convincing evidence that Appellant abandoned his son as required for termination of parental rights;
2. Whether termination of Appellant's parental rights was in his son's best interests.

Before a parent's rights can be terminated, statutory abandonment must be found by clear and convincing evidence. *In re: Welch*, No. M1999-02649-COA-R3-CV, 2000 WL 192580, at*3 (Tenn. Ct. App.). Further, this abandonment must be willful, *In re: Swanson*, 2 S.W.3d 180 (Tenn. 1999),

as the failure-to-visit definition contains an element of intent. *In re Adoption of Copeland*, 43 S.W.3d 483, 488 (Tenn. Ct. App. 2000); *Hickman v. Hickman*, No. E2000-00927-COA-CV, 2000 WL 1449853, at *1 (Tenn. Ct. App.). "Abandonment inquires are heavily fact oriented and the courts may consider any fact that assists them in deciding whether the parent's conduct demonstrates a conscious or willful disregard of all his parental duties." *In re: Satterwhite*, No. E2000-02107-COA-R3-CV, 2001 WL 387389, at*4 (Tenn. Ct. App.).

The trial court determined that Mr. Goins' parental rights should be terminated due to abandonment as a result of Mr. Goins' failure to visit his son for four months prior to the petition being filed. The statutory definition of abandonment provides:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or make reasonable payments toward the support of the child.

Tenn. Code Ann. §36-1-102(1)(A) (Supp.1998). The burden rested with Mr. & Ms. Bergquist to establish, by clear and convincing evidence, that Mr. Goins willfully abandoned his child. *Carr v. Moore*, No. 01A01-9807-CH-00402, 1999 WL 820608 at*3 (Tenn. Ct. App.).

> The clear and convincing standard imposes a heightened burden on those seeking to terminate the rights of a natural parent. To meet this standard, a party must go beyond the mere threshold of a preponderance of the evidence:

> Clear and convincing evidence eliminates any serious or substantial doubt concerning the correctness of the conclusions drawn from the evidence. It should produce in the fact-finder's mind a firm belief or conviction with regard to the truth of the allegations sought to be established.

*Id.* at *3 (*quoting O'Daniel v. Messier*, 905 S.W.2d 182, 188 (Tenn. Ct. App. 1995)).

The facts do not support this finding.

> Termination of a person's rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and child involved and "severing forever all legal rights and obligations" of the parent. Tenn. Code Ann. § 36-1-113(*l*)(1). Because of its consequences, which affect fundamental constitutional rights, courts apply a higher standard of proof when adjudicating termination cases. . . .

> Under this heightened standard of review, we must first review the trial court's findings in accordance with Tenn. R. App. P. 13(d). That review is *de novo*,

-8-

with a presumption of correctness for the trial court's findings of fact, unless the preponderance of the evidence is otherwise. Then we must determine whether the facts make out a clear and convincing case in favor of terminating the parents' parental rights.

*Brown v. Rogers*, No. M2000-01277-COA-R3-CV, 2001 WL 92083, at*2-3 (Tenn. Ct. App.). It is uncontroverted that Mr. Goins did not visit Z. C. G. for a least 4 months prior to the Bergquists filing their petition. The issue, however, is whether the evidence showed this lack of visitation to be willful. We believe the evidence does not establish a clear and convincing showing that Mr. Goins' failure to visit was willful.

The trial court observed the demeanor of the witnesses and heard their testimony, thus this determination is entitled to great weight. *Weaver v. Nelms*, 750 S.W.2d 158, 160 (Tenn. Ct. App. 1987); *In Re Welch*, No. M1999-002649-COA-R3-CV, 2000 WL 192580 at *3 (Tenn. Ct. App.). Further, the court found that Mr. Goins was not a credible witness. However, even taking all facts as found by the judge, we do not see clear and convincing evidence of willful failure to visit. Further, in making his finding, the judge failed to consider several uncontroverted facts and gave inappropriate weight and inferences to others.

Mr. Goins visited his son regularly and had no visitation problems until Ms. Bergquist decided to re-marry. Shortly thereafter she chose to move from Greene County, where Mr. Goins lived, to Hendersonville and began interfering with Mr. Goins visitation. At one point she even refused his visitation for several weeks prompting Mr. Goins to file a petition for contempt.

Although, Mr. Goins behavior has been far from exemplary (often times down right reprehensible), Ms. Bergquist has, by her own testimony and admitted actions, been less than co-operative in working with Mr. Goins to make Z. C. G. available for his visitation. It was not unreasonable for Mr. Goins to believe that Ms. Bergquist was not going to bring Z. C. G. for visitation on October 15, after he waited for over an hour, considering past situations when he has gone to the drop off point and she failed to show up. Further, A pre-school Christmas play is certainly not of more importance than the opportunity to participate in an extended family Christmas tradition. It is also uncontroverted that Mr. Goins called again on Christmas Eve to try to get Z. C. G. for his Christmas visitation. In addition, Ms. Bergquist should have called Mr. Goins upon arriving in Greene County for Christmas; she should have returned Mr. Goins call about his Grandfather's death, and she should allow Z. C. G. to communicate with has paternal Grandmother. Regardless of her contempt for Mr. Goins and his family, as long as he has parental rights, it is her obligation, as custodial parent with primary control over the child, to work on her end to foster the relationship between Z. C. G. and his father. In this case, it appears that she did just the opposite in the months leading up to the filing of the petition in this matter.

However, the foregoing being said, Mr. Goins is certainly skating on thin ice with regard to his parental rights. Although the evidence at this time does not clearly show willful abandonment,

Mr. Goins should now be on notice that any further neglect of his visitation will certainly be subject to more liberal interpretation as evidence of willfulness.

As we cannot find clear and convincing evidence of the element of willfulness necessary for abandonment, it is unnecessary to determine the child's best interests based on the factors set out in T.C.A. §36-1-113(i) and *Brown v. Rogers.*

The judgment of the trial court is reversed and the case remanded for further proceedings consistent with this opinion. Costs on appeal are taxed to Appellees.

_____
WILLIAM B. CAIN, JUDGE